## CIRCUIT COURT OF FAIRFAX COUNTY

Leonard Berger

v.

Christopher Antigone et al.

### June 26, 1996

### Case No. (Chancery) 139697

BY JUDGE M. LANGHORNE KEITH

The Court heard evidence in this matter on April 1, 2, 3, 4, and 8, 1996. At the conclusion of the Complainant's case, the Court granted Defendants' Motion to Strike as to Count II (right to purchase LLC interest) and at the conclusion of the case and oral argument, denied the relief requested in Count III (for dissolution and accounting). The Court requested post-trial briefs on Count I, specifically on the consent, equitable estoppel, buy-out, and tender issues raised under the rubric of that Count. The Court has now had an opportunity to review the excellent briefs submitted by counsel and, for the reasons stated below, finds that Dr. Berger is no longer a partner in the TAB I Associates partnership.

### I. *Background*

In 1984, Christopher Antigone, Samuel Taustin, and Dr. Leonard Berger formed Tab I Associates, a general partnership ("Tab I"), a business whose purpose was to acquire, own, and develop certain real property in Loudoun County (the "Property"). Antigone discovered this investment opportunity, took it to his uncle-in-law, Taustin, who in turn brought his old friend, Dr. Berger, into the deal. The Partnership agreement for Tab I was drafted by Dr. Berger's attorneys.[1] Antigone managed the partnership in return for his one-third partnership interest while Taustin and Dr. Berger,

---

[1] The certificate of partnership for Tab I was signed on October 17, 1984. The partnership agreement was dated August 27, 1985.

also one-third partners, were the money partners who funded the entire amount of capital required to fund the partnership.[2] From 1986 to 1989, Antigone was busy dealing with the alignment of the Dulles Roll Road extension, an alignment that was critical to the enhancement of the Property's value. The interest that Tab I acquired in the Property was a one-half undivided interest in a 260 acre parcel, the other half interest in which was owned by the Alward family. It had always been the intention of the Tab I partners to acquire the Alward interest. The opportunity to do so arose in 1993 but Dr. Berger declined to join the new partnership formed to purchase the Alward interest (Dulles Gateway Associates, L.L.C., hereinafter "DGA"). In September of 1993 Dr. Berger signed a formal document evidencing this decision. Upon acquisition of the Alward interest, Tab I and DGA had to deal with several matters, primarily the clean-up of the parcel and a tax appeal of the Loudoun County tax assessment. The expenses connected with these matters required an infusion of cash into the Tab I coffers.

During the history of Tab I, Antigone testified he made some twenty-seven cash calls only six or so of which were in writing or accompanied by any written back-up. The strokes suffered by Taustin[3] and the cash calls subsequent to the Alward acquisition led to this litigation. A December, 1993 cash call was made by Dr. Berger in January of 1994, but a June 7, 1994, cash call, although made by Taustin, was not made by Dr. Berger. This led Antigone and Taustin to invoke the forced-buy-out provision of the Tab I partnership agreement. Dr. Berger claims he never approved the June cash call and in any event the tender of the purchase price was improper thus invalidating the purported buy-out. Antigone and Taustin

---

[2] For a time, Antigone funded capital contributions under the mistaken belief that he was required to do so under the partnership agreement. Dr. Berger loaned Tab I $900,000.00 to make the acquisition. Four years later Taustin paid this loan off and lent Dr. Berger funds to make his capital contribution.

[3] In 1992, Sam Taustin suffered the first of two debilitating strokes. While he still went to the office, he did ask his nephew, Jay Taustin, to handle Tab I matters for him. The DGA acquisition coupled with Sam Taustin's reluctance to confront his old friend, Dr. Berger, led to a breakdown in what had previously been an informal and cordial relationship. This led eventually to Dr. Berger seeking to dissolve the Tab I partnership on the ground that Sam Taustin was "incapable of performing his part of the partnership contract." Va. Code Ann. § 50-32(1)(b). After hearing expert testimony as well as testimony from Taustin and Dr. Berger, the Court struck Count III which sought to dissolve the partnership on that basis.

counter that Dr. Berger did consent to the June cash call or is equitably estopped from denying consent. As to the tender issues, Antigone and Taustin assert that tender was either unnecessary or proper or that Dr. Berger waived any defect in the tender.

## II. *The Consent Issue*

Antigone and Taustin argue that Dr. Berger approved the expenditures necessitating the June 7 cash call at a January 3, 1994, meeting. Dr. Berger disputes this.

As noted above, once DGA acquired the Alward interest several pressing matters had to be resolved by Tab I and DGA. Some legal bills related to the acquisition of the Alward issue were in dispute. In addition, cash calls were necessary to pay for clean up and for a tax assessment appeal. Furthermore, although Dr. Berger had waived his right to participate in DGA, he was pressing to be admitted to that L.L.C. On December 3, 1993, Antigone wrote Dr. Berger a three-page letter setting forth some of the issues facing Tab I and also requesting a $42,000.00 capital contribution. Year-end, Antigone and Dr. Berger had a telephone conversation concerning Tab I. Antigone testified that Dr. Berger tried to "tie" his contribution to his admission into DGA and that Antigone objected to such a connection. This led to a meeting on January 3, 1994. There is no dispute that at this meeting all the attendees (Antigone, Dr. Berger, and Jay Taustin for Taustin) agreed that after March of 1993 DGA would be responsible for the legal bills in connection with the Alward acquisition. The only notes of this meeting were taken by Dr. Berger. Antigone and Jay Taustin's account of the meeting differs from Dr. Berger's. They stated that Antigone reviewed the needs of the partnership item by item and Dr. Berger approved those proposed expenditures. Dr. Berger denied any such approval and points to his letter of March 1, 1994, as evidence that no such approval was given on January 3. Antigone testified that after the January 3, 1994, meeting he talked further with Dr. Berger telling him that while the cleanup costs were now estimated at $150,000.00 they could go as high as $200,000.00 (Tab I's share would be fifty percent). Dr. Berger's notes of the January 3 meeting reflect that legal expenses and cleanup costs as reflected in the June 7, 1994, cash call were specifically discussed. Moreover, at no time subsequent to that cash call did Dr. Berger himself claim that he had not approved the items reflected in that call. In view of this, the informality of the previous capital calls and Antigone's testimony that he never made expenditures without his money partners' approval, the March

letter seems little more than further posturing by Dr. Berger concerning his attempt to participate in DGA. This reading is bolstered by the opening salvo from Dr. Berger's lawyer after Antigone's August 19 letter pleading for Dr. Berger's capital contribution. Essentially, Mr. Gorelick concentrated on Dr. Berger's right to participate in DGA and while he straddled the Antigone/Taustin ship with a barrage of allegations, none of them included the allegation that Dr. Berger failed to approve the June 7 capital contribution. Not until November 11, 1994, did Mr. Gorelick assert that Dr. Berger had not approved the expenditures covered by the June 7 cash call. Despite Mr. Gorelick's assertions, after hearing the testimony and reviewing the exhibits, the Court concludes the Dr. Berger did approve the expenditures and thus his failure to make the June 7 cash call was a default under paragraph 5(f) of the Tab I partnership agreement.

As this finding moots the estoppel issue, I turn next to the issue of whether the non-defaulting partners improperly tendered the purchase price for his shares to Dr. Berger.

### III. *The Tender Issue*

Dr. Berger argues that as the amount tendered by the non-defaulting partners was less than the value of one-half of his capital account, was not tendered to him personally, and further was subject to conditions not called for in the partnership agreement, it was not a good tender under paragraph 5(f). Antigone and Taustin counter that, as Dr. Berger had asserted he was not in default, no tender was necessary. Moreover, Antigone and Taustin argue that they did tender the proper amount and in any event Dr. Berger, by failing to make a timely objection, has waived any defect in the tender of the purchase price.

There can be little question but that paragraph 5(f) grants the non-defaulting partners an option, exercisable within thirty days, to purchase the defaulting partner's interest in Tab I Associates.[4] Dr. Berger correctly points out that, at least in the context of real property, the proper acceptance of such offers is strictly construed. See, e.g., *Jones v. Horner*, 260 S.W.2d 198 (1953) (failure to include ten percent payment with exercise of option fatal to proper exercise of the option); *Master Laboratories, Inc. v. Chesnut*, 154 Neb. 749, 49 N.W. 2d 693 (1951) (purported acceptance of

---

[4] Paragraph 5(f) does not create a right to re-purchase Dr. Berger's partnership interest because Dr. Berger did not purchase his interest from either Antigone or Taustin. Thus, the rule of *Trailsend v. Virginia Holding Corp.*, 228 Va. 319 (1984), does not apply.

option coupled with demand for a warranty deed, was not an effective acceptance). But acceptances in connection with other types of property interests are less harshly reviewed. See, e.g., Va. Code Ann. § 8.2-206 (offer to make a contract for the sale of goods shall be construed to permit any reasonable acceptance unless unambiguously indicated otherwise); Va. Code. Ann. § 8.2-207 (additional terms in an acceptance of an offer to sell goods not necessarily ineffective as an acceptance). Here, the interest being purchased is not real estate but personal property. Va. Code Ann. § 50-26. In addition, the Tab I Associates partnership agreement is silent on how the defaulting partners are to effectuate the purchase of the defaulting partner's interest. It is clear to the Court that the buy-out provision in this case and in other partnership agreements are important to the ability of partnerships to continue to function when confronted with disputes between partners. Thus, a harsh "strict-tender" rule, while it may be correct in the real property arena, makes little commercial sense in the context of a partnership dispute. The parties have cited no cases dealing with the tender issue in the partnership buy-out context, and the Court has found none to guide it in determining what standard to apply.

Partnership interests are not goods, but the official comment to the UCC, Va. Code Ann. § 8.2-105, states that the exclusion of an interest from the definition of goods is not intended to prevent the application of a particular section of Article 2 by analogy to other interests when the rationale of that section makes such application sensible.[5] Since the Court must resolve the tender issue by analogy, it believes that the flexible standard set forth in Va. Code Ann. § 8.2-106(a) is the appropriate lodestar rather than strict tender. Thus, in the circumstances confronting the non-defaulting partners, the tender to Mr. Gorelick and the delivery of the checks (and the amount of those checks)[6] to Mr. Stone, as escrow agent,

---

[5] The comment specifically mentions securities but the rationale is equally applicable to partnership interests.

[6] Before tendering the checks, the non-defaulting partners obtained advice from Tab I's regular accountant as to the value of Dr. Berger's capital account. Her testimony at trial was contested by Dr. Berger's expert, but the Court found Ms. Callaham to be a believable witness and accepts her testimony as to Dr. Berger's capital account. More specifically, the Court rejects the testimony of Mr. Rosenberg concerning the proper allocation of the December, 1993 cash call which Dr. Berger made in January of 1994. The authorities cited by Ms. Callaham indicate that without some security having been given, it would be unusual to credit Dr. Berger's 1994 payment on the 1993 books. Dr. Berger

were not unreasonable and a reasonable effort to purchase Dr. Berger's shares is all that is required.

In contrast, the demand that Dr. Berger execute the Assignment of Partnership Interest delivered to the escrow agent was not reasonable. Such an assignment is nowhere called for in the Tab I partnership agreement nor can it be deemed merely additional terms that Dr. Berger was free to accept or reject. See Va. Code Ann. § 8.2-207. A simple assignment evidencing the transfer would have sufficed to transfer Dr. Berger's shares, and the non-defaulting partners crossed the bounds of reasonableness in demanding he execute the assignment delivered to Mr. Stone. *Cf. Master Laboratories, Inc., supra.* This defect, otherwise fatal to the Antigone/Taustin cause, is excused, however, because Dr. Berger had indicated that he would not accept any tender because he recognized no obligation to make a capital contribution. *Hopkins v. Griffin,* 241 Va. 307 (1991); *Reiber v. Duncan,* 206 Va. 657 (1965); *Henderson v. Foster,* 139 Va. 543 (1924). And while a non-defaulting partner might be able to raise an improper tender defense, a defaulting partner is precluded from doing so. *Federal Ins. Co. v. Starr Electric Co.,* 242 Va. 459, 468-69 (1991).

The relief requested in Count I is therefore denied.

---

took the risk of this result when he refused to make his June 7 cash call after being put on notice that his partners intended to invoke paragraph 5(f).